And at this time we'll hear Veleron v. Morgan Stanley. Good morning. May I please support Aaron Marks for Appellant Veleron Holding. On September 30, 2008, less than three hours after receiving material non-public information, Morgan Stanley began short-selling hundreds of thousands of shares of Magna stock, causing a drop in its share price. Making matters worse, this insider trading by Morgan Stanley and its attendant stock price drop occurred on the eve of the disposal of 20 million shares of Magna stock, a disposal to be conducted by Morgan Stanley per contract under which Morgan Stanley was obligated Well, per contract with somebody other than your client. Yes, Your Honor. And you had a contract, your client had a contract with that company, right? Correct, correct. But not with Morgan Stanley. That's correct, Your Honor, and that's what this appeal was. So if Morgan Stanley did something that's unwise or effected a breach of that contract, your beef would be, would it not, with BNP Paribas? Your Honor, we believe that the district court erred in not, in denying the notion that Veleron had third-party District court's dismissal of the breach of contract claim was based on the perceived notion of a lack of intent to create a third-party beneficiary right in Veleron. Well, wouldn't BNP have an independent compelling interest in assuring that Morgan Stanley, in effecting the liquidation, did so for the maximum value possible? BNP certainly would have that interest. As your client would as well. That's correct, Your Honor. So where does your client get some kind of independent interest here? Well, Your Honor, we think that both BNP and Veleron had a direct interest in the outcome of Morgan Stanley's performance. But Veleron's interest was even greater than BNP's because under the circumstances of this contract, in the event that the value of the shares upon being liquidated was greater than the balance of the loan, any surplus from that would go to Veleron and to Veleron only. And I don't mean to say this harshly, but Veleron's interests are not really at issue here. Why would it be in BNP's interest to allow Veleron to sue Morgan Stanley to comply with an agreement that Veleron is not a party to, in this case? So under the pledge agreement, BNP had an obligation to, in liquidating the shares upon a default on the loan, to seek the best price available for the sale of those shares. That was its obligation to Veleron under the pledge agreement. Does it use those words, best price? Because I don't see that provision. I am perhaps paraphrasing, but it is almost exactly to that notion that they had to seek the best price available. And in connection with the entire purpose of this disposal agreement was to pass on that obligation to seek the best price available from BNP to Morgan Stanley. And this is captured, you know, throughout the agreement. The whereas clauses, you know, reference Veleron, reference the obligations to Veleron under the pledge agreement throughout the whereas clauses. Clause C in particular demonstrates a clear intent to benefit Veleron by this contract. If that is so, wouldn't it be odd that Veleron is not mentioned and that there is an endowment clause and a merger clause, which would seem to run counter? Well, first of all, Your Honor, Veleron is mentioned. They're referred to as the pledge or. No, I understand. Because it is not mentioned as a beneficiary. It is mentioned because it is embedded in these transactions and you can't describe the transactions without referencing your client. So in the contract, there is no clause that allows for third-party beneficiaries specifically. There is also no clause that declines to have third-party beneficiaries. It says this agreement shall be binding upon and anewer, probably misspelled, to the benefit of each party to this agreement. And we think that this is exactly where the district court made its error in relying so heavily on this enormous clause. Well, and it's not just the enormous clause. There's, as Judge Jacobs mentioned, a merger clause. There's an anti-assignment clause. Are you aware of a case where there's a trifecta of clauses that suggests that there is no intended third-party beneficiary under the contract? Well, Your Honor, we cite to several cases in our briefs where all three types of clauses exist. I don't recall if all three were in there, Your Honor. But respectfully, the enormous clause, I believe, is the only one of those clauses that would speak directly to a third-party beneficiary. The other two clauses, certainly a third-party beneficiary can live happily side-by-side an assignment clause or a merger clause. Where we think that the district court did go awry on this was her reliance on Judge Kaplan's decision in the Piccoli case, where we think that case is wholly distinguishable. In that case, Judge Kaplan pointed to the enormous clause as the best evidence that there was no intent by Calvin Klein and its contract manufacturer to benefit Calvin Klein's Scandinavian distributor. In that contract, there was zero reference to the plaintiff distributor. There was no provision that would necessarily benefit the distributor. Here, Velleron is referenced throughout the agency disposal agreement. The benefit to Velleron from the best price obligation in Section 2 is not merely incidental. It's direct. Indeed, I would say that no one has a greater interest in Morgan Stanley performing under that provision than Velleron. You referred at the outset to the trading by Morgan Stanley on inside information of somebody. And my question to you is, what damages did you prove from that? And how much is it, and how much, how did you prove it? Yeah, okay. Your Honor, so the damages here were really twofold. One was the diminishment in the realization of the disposal of the shares. The deficit, we believe, that Velleron owed to B&P was increased from what would be $67 million to $79 million. What was the proof of that? There was expert testimony to that, Your Honor. And what is the proof of a, where is the breach of duty here? Your Honor, there were a few different lines that we put up as breach of duty, one of which relates directly to the question of whether there was a duty to Velleron under the agency disposal agreement. Assuming that there is no duty, where is the breach of duty then? The other line was from the relationship, was the history, industry standard, you know, as to. . . Industry standard? I mean, look, insider trading laws are elastic, but they're not that elastic. So they don't, a duty is not premised on industry standards. So what else is there? The relationship that, again, the relationship that came out under the agency disposal agreement. It's really the agreement. And we think that's the main focus. As B&P owed an obligation to Velleron, and this was an agency disposal agreement, we believe that Morgan Stanley became B&P's agent. Am I correct that the damages figure that you cited and that you say was supported by expert testimony is the loss attributable to the agency disposal to what one would think of as a fire sale, selling it all in one day? But I was asking you particularly about damages from insider trading. So, Your Honor, what the expert testimony demonstrated was that their short selling in advance of the disposal lowered the price of the stock, you know, on the eve of the disposal by, I don't remember if it was 30 cents or 12 cents, such that, you know, that the disposal then yielded $12 million less. That was the expert testimony. Thank you. Your Honor, if I can shift. I can't tell how much time I have left. You have no time. Okay, Your Honor. Thank you. Actually, you have two minutes of rebuttal. Yeah. Thank you. We'll hear you then. Good morning. Good morning. Thank you, Judge Jacobson. May it please the Court, Neal Katyal for Morgan Stanley. This Court has been clear that when a third party can enforce a contract only when the contract, quote, clearly evidences an intent by the parties to permit enforcement by a third party, that decision in Beyers-Reich v. Aladdin, with two of you signing that opinion, controls this case. Judge Lohier, as you said, there is a trifecta in this case. There are three clauses, an anti-assignment clause, a merger clause, and an annulment clause. And those three taken together, I think, are devastating to this idea of an intent. The difference between this case and, I call it Landesbank because I can't pronounce Beyerish, but the difference between those two cases, or that case and this one, is that in Beyerish-Landesbank, if I recall correctly, there was an explicit provision that said the parties do not intend to have anybody benefit from this agreement. Correct. Except it said except as provided in the agreement. So the agreement did say, contemplate, that there would be some third party beneficiaries in that case. And, indeed, that agreement that you analyzed in that case gave that third party a bunch of rights. It said that you could even remove the investment manager. So it gave that third party all sorts of rights in the text itself, none of which is at issue here. As Judge Jacobs was saying before, you know, this contract does mention Valoran, but only as background information, not giving any certain rights to Valoran or anything like that. I think my friend's best argument on this is the whereas clause C. And if you read his reply brief, you might be tempted to think it's a good argument. His reply brief at page 5 says the following. It says, quote, as the language of whereas clause C confirms, Morgan Stanley's role was to facilitate a disposal of the pledged collateral in a manner compliant with BNP's obligations and Valoran's rights. And that appears as a quote in his brief. The problem is it's not a quote of the agreement. It's a quote of his opening brief. And the very fact that he has to add that language both in his brief and then today, which you just heard, I think underscores our fundamental point. This is not even close to the clear evidence that's required for an intended beneficiary. At least at the motion to dismiss stage, isn't there some case law support that where you fix a party's obligations under a contract by reference to an obligation owned to a third party, that that does support an inference of beneficiary status? Sometimes, Judge Livingston, you're absolutely right. And those are cases in which you don't have this trifecta of clauses. And that's why my friend, when he was asked by Judge Loyer, is there any case that you can cite? He's got nothing. And indeed, case after case, Banco Espirito, Sazerac, Pickley, these are all cases where the motion to dismiss was granted and affirmed. So I just don't think there's any possible argument for that very high threshold for intended third party beneficiary here. If there are any other questions on that, I'm happy to deal with them. Otherwise, we can talk about the securities.  He has to show that there's no waiver. He has to show that if he wins that, that it's plain error and that that meets that high standard, despite this court's decision in OBIS. And he's got to show damages. And let me start with damages. Judge Jacobs, our point to you is not that they hadn't showed the causation between $67 million in deficiency or $79 million in deficiency. We'll spot them that. Our point is, at the end of the trial, what came out was evidence that they had settled that entire obligation and signed a release with BNP for $25 million. They don't know anything more. And they didn't show an increment beyond that. Exactly. And as the district court said, this is at page A1561, quote, until Valoran pays $68 million in one cent, Valoran hasn't paid a dime that's attributable to any Morgan Stanley activity. That, to me, is devastating on the notion of damages. It also underscores how this can't even meet plain error. Because even if you think there was some violation here, it's not going to come close to the standard that Judge Jacobs laid down for this court for the Second Circuit on plain error in the Pescatori case, which we cite, which is, quote, the plain error exception should only be invoked with extreme caution in the civil context only when an unpreserved error is so serious and flagrant that it goes to the very integrity of the trial will a new civil trial be warranted. And whatever he said here I don't think gets you there. And then the last thing I'd say – Mr. Cattell, you would agree that we don't need to deal with this waiver versus plain error issue. I don't think you have to get into it because I don't think they've met even the plain error standard, which is, as Judge Jacobs said in that opinion, an extremely high one. The last thing I'd say about insider trading, unless you have any other questions, is our point is not as much about whether there was a duty, which was your interchange with my friend. We can spot them that, too. The problem is there wasn't a known legal duty. There wasn't a scienter – the scienter burden wasn't met. I'm just asking, even preceding that – Exactly. – whether there's a duty. Exactly. And my only point to you is even if you concede all of that, they didn't show scienter. The jury was expressly asked the question, quote, did the defendant's act with the requisite state of mind scienter? The jury came back no. His point is, while there is no scienter requirement in the law, I think the Second Circuit decision in OBIS says in every insider trading case scienter is required. I think his argument is a little more refined than that. It's that there may be a scienter requirement, but it's not knowledge that you have a duty. That if you have a duty, you either do or you don't, and you ought to know whether you do. And you don't have to prove that they knew that your client knew it had that duty. Exactly. And let me just read to you what the last part of the OBIS quote is from this court. Quote, in every insider trading case, the unlawful actor must know or be reckless in not knowing the conduct was deceptive. And it's that duty that he has to know, running to the source of the information. That's what the Supreme Court has said in O'Hagan with respect to misappropriation cases. So because of that, I don't see any argument here, and certainly not one on plain error. Are there any other questions? Thank you. We'll hear rebuttal. Your Honor, first as to the question of damages. First of all, this issue ultimately was never reached by the district court. It was not decided whether, in light of this $25 million settlement, there were or were not still damages. As I recall, didn't the court come up to the point of almost deciding it? It was close. And then deciding, let it go to a jury, which is what, you know, once you have a trial going, that's good craft. That's what cautious judges do. I agree, Your Honor. But the truth is, we didn't brief it. And, you know, respectfully, we believe that a reasonable juror, you know, under the circumstances, could still find. Isn't it arithmetic? Well, it is arithmetic, Your Honor, in as much as, yes, we paid $25 million. But, you know, it's still the case that some portion of that, you know, is attributable to Morgan Stanley's conduct here. And, yes, the arithmetic, you could do a proportionality that, you know, if Morgan Stanley had not, you know, had not traded the way they did, our ultimate damages would have been $66 million instead of $79 million. And a jury could have done math to say, well, they wouldn't have paid $25, they would have paid $22 instead. But the Sienter issue. Yeah. Mr. Katyal spotted you, the duty issue, the Sienter issue in OBIS. How do you get around OBIS in that language? Well, Your Honor, quickly, I mean, we have a different view of Sienter, as Judge Jacobs pointed out. And we rely on the Teicher case adopted by Royer, as well as the, you know, the SEC rules where, you know, the deceptive act defendant is presumed. Our most recent pronouncement on Sienter is in SEC v. OBIS in 2012. Correct, Your Honor. But you're asking us to go back to 1993 and to the SEC rules. Ninety-three was a good year. But we don't believe, if you look at the issue, that, you know, Your Honor's addressed it directly. It's a civil case, not a criminal case. And we do think that Royer was not overturned by OBIS. Last thing, Your Honor, on the, I would just say, on the clarifying instruction, which we did not directly address, you know, we do think that a close look at that, it was prejudicial. And we do believe that it was, you know, rightly preserved under the circumstances of that Friday afternoon. Thank you very much. Thank you both. We'll reserve decision.